Welcome to the second day of this particular panel's sitting this month, this week and this month. We have a lawyer who was here yesterday who is returning and I didn't mean to slow you down too much, but you can come forward if you want. We have three cases this morning. First one that we will hear is Patrick Thomas v. Cook Children's Health Care, I believe that's Mr. Sanford. Yes. Please support counsel, it's a pleasure to be here again today. Brian Sanford here with Elizabeth Beebe Sanford, lead trial counsel Stacey Gray, on behalf of the appellant and plaintiff Dr. Patrick Thomas. The Cook Hospital acknowledged through its trustee who was also a voting committee member that although Dr. Thomas is an excellent doctor with great outcomes, he had to work twice as hard at the hospital because he is a black man. Dr. Thomas is an award winning surgeon who has a record of zero patient care issues, who worked hard to reach this level of service in his life. When he reported and opposed this double standard race-based standard and years of harassment, Cook retaliated and forced him out, using as an excuse untrue, unsubstantiated, uninvestigated, and here today unsworn to accusations of abusive behavior by some operating room staff. Nineteen in effect, huh? Nineteen. It could have been a thousand. Unsworn to, untrue. Yes. Let me just ask you something. Sure. Just when I read the briefs, it just struck me that Cook was really trying to keep Dr. Thomas. I mean, after they had the experience with him earlier and he got counseling and in their eyes were rehabilitated and they gave him mentoring responsibilities and management responsibilities. I mean, isn't that inconsistent with them wanting to run him off? It is. It is true. They wanted him. They even said, we want you here at Cook. But these emails, complaining of discrimination and retaliation, are not making it easy. They want him there. They would have kept him there if he just had not opposed and reported the discrimination. The earlier event, the earlier event was based on unsubstantiated. It's the same problem. And yet he accepted the corrective behavior, which he was going to accept the alleged corrective behavior the second time. He was ready to accept all of those conditions. The first time he did it, he put his head down, he told the psychologist, I'm being discriminated against. He wrote notes to him in the middle of the night, I'm being discriminated against. I'm not going to do anything this time. I'm going to put my head down. Maybe it's an appropriate reaction. It's one you don't have to do. It's one he didn't do the second time. It wasn't a success story. The complaints died down because the complainants had been caught lying. They had made this one complaint, Code Gray, saying that he moved a body when he wasn't even there. Another physician said, it's a complete fabrication. I was there. He was not a part of it. Somebody who did this should be held accountable. They were not held accountable, but the cat was out of the bag. So everything slowed down for several years until they thought, well, maybe the coast is clear. They can build it back in. Sure, a jury could infer that it's a successful story. A jury could also infer that it's just as the doctor said, it wasn't needed the first time. It was all unsubstantiated. They're trying to placate the staff who's discriminated against him, and they're doing it again. Let me ask you, wasn't Cooks able to accept the word of this many staff members? I mean, as long as an employer makes reasonable decisions based on reports by staff, they can accept those, can't they? They can if they follow their procedures, which is they're supposed to investigate these within six months, evaluate them every twice a year. Dr. Reeds did look into it at one point. Years later, on some of them, and actually found that they were unsubstantiated. Well, but he found that most of them weren't, were good complaints. He found, no, he found most of them were not, and he found, I think, maybe four, all he could find is that two comments, Dr. Thomas admitted, yes, he said, but there were nothing comments. Nothing else was substantiated, zero in the record. I would challenge the other side to say, show us in the record where anything was substantiated. Well, something in the record, when he talked to the head nurse, who I gather had probably been there a long time, a trusted employee, she said she's getting all these complaints, and she believed them. Well, then, there's a process, there's a process to investigate, there's a process to substantiate, there's a process to find out if they're true or not. Not done. Not done until years later, and when it's done years later, they're all unsubstantiated except for one or two comments. Some of them were that he wasn't responding to a pager, but he's using a beeper at the same time, and they said, that's exactly underwritten policy, it's just fine. One was an error under EPIC, which wasn't his fault. There was nothing there, and guess what, all of the testimony, all of the sworn testimony is in his favor, saying he was not abusive, he never exhibited any of these behaviors. There is no sworn testimony saying he did any of this. All of those complaints are unsubstantiated except for one or two comments, which are almost nothing, and not sworn to. Nobody has backed them up. Did you put in any statements or depositions of the staff members who made the complaints to say that it didn't happen? Yes. Three nurses that worked in there that said, no, this did not happen. This is not him. He is not unprofessional. He is always professional. He is soft-spoken. He doesn't get upset. He doesn't abuse. Who were those, do you remember? It was Williams. I should have the names. It's in the briefs, but there's three nurses. One of them's name is Williams. I apologize, but there's two other nurses. That's all right. I'll look it up. Yeah. And there's zero sworn testimony of abuse, zero, nothing. So it's at least a fact issue as to whether or not the employer should be able to rely on unsubstantiated complaints that they don't follow their investigative process. Also, we have their own testimony where Dr. Reeves says nurses can destroy a doctor's career through side gossip. He also said, I can see that this might be a conspiracy. He also said here, if you look at tab 10 of the record excerpts, in the letter, close to the final letter or the final ultimatum letter to Dr. Thomas, he says, rather than focusing on the validity of one report or another, they were not going to rely on the validity. They couldn't justify any of the validity of any of it. So a jury could say, look, all of that is unsubstantiated and pretext. So in terms of retaliation, the lower court examined the retaliatory timeframe too broadly. It excluded the more relevant timeframe closer to the time of the termination. So the lower court looked for a year and a half timeframe for the proximity and the court should have looked at the last seven months or from September to February where Dr. Thomas complained over 20 times and not one 30 day period went by without an adverse action, including up to the ultimate. The doctor, Dr. Thomas, was willing to accept all of their conditions. The final straw was when they wanted him to sign this voluntary agreement that they'd not had anybody sign ever in their hundred plus year history. And in it, he's already represented by counsel. They want him to admit to false statements and he's not going to do it. Did they ultimately agree to just accept an email? He wouldn't have to sign a statement? No. He had to. My understanding is that the record is he had to agree with this voluntary. He had to agree to this statement by email. He could do it by email, but he had to agree to it. He had to agree that he was not under investigation. He was under investigation. He had to agree that this voluntary agreement is not considered corrective or disciplinary action. It was. So he did not want to give up his argument that he was being treated adversely if he was going to bring an action against them. And he'll agree to all of the conditions, don't make me sign or agree to this voluntary statement. I will agree to meet with the nurse. I will agree to the coaching. I will go to do everything. But I'm not going to, even though it's, even though as the court recognized, it's adverse actions. But you know, and these discussions went on for a long time, maybe a year or longer. Yes. And right in the middle of those discussions, he gets another event report. Okay. So again, he could have gotten a thousand reports if they're all false, if they're unsubstantiated. It's it's a, that's fine. Look at it, deal with it. And during these discussions, he consistently refused to acknowledge that he'd done anything wrong or that he had any responsibility that he refused to do either of those. So look at him, look at the doctor accepting to meet with Gibbs. Look at the doctor accepting all those conditions. That doesn't sound like a doctor that's trying to fight against something that's he's willing to do. If you want to fight for the truth, you're not going to accept a falsehood. And a jury could see it that way. Why would you, if you're accused a hundred times of murdering somebody, why would you say, well, at least one of those times you should have agreed? That would be what a jury could think. Yes. Oh, so, uh, what we have here is on the one is on the one hand, all of the sworn testimony is in favor of Dr. Thomas. We have zero sworn testimony in favor of the hospital, except that they just say we relied on these unsubstantiated, uh, uh, accusations and didn't follow their policies. Dr. Reeves report of his investigation too. Yes. His investigation too, which, which, uh, found none of them substantiated except for one or two comments. So there's, there's nothing, there's nothing there. So at a minimum viewing the evidence in the light, most favorable to Dr. Patrick, there's a reasonable jury possibly in his shoes could consider this as discrimination or retaliation. The lower court violated the law of looking at it, all the evidence in the light most favorable to the non-movement and instead looked at all the evidence the other way. And that was the, that's the fatal error for which this court should reverse it and remand for a trial. All right. Thank you. Thank you. May it please the court. My name is Jeffrey Harper with Winston Strawn. I'm here along with Mike Woodrum from my office. Also out in the gallery with us today is Rick Merrill, the CEO of Cook Children's, as well as our general counsel. And we're all here today asking you to affirm the decision of the lower court, both on the motion to dismiss the hostile work environment claim, as well as the summary judgment claims for discrimination and for retaliation. The key facts here, well, I've argued several appellate cases rather here to courts without in other appellate courts. And it seems to me that this is probably the first one I've had where there's this much dispute over to what the record actually says and what the underlying documents prove. And I think that to the extent the court finds itself needing to go look at that, that that sort of draws the main point that we have here, which is that we keep getting statements from Dr. Thomas that certain things were agreed to when the evidence before the court and the evidence before the court below show the exact opposite. What we have is this. Cook Children's Hospital is a children's hospital that has a procedure and policy in place for how they deal with abusive behavior by their staff. I mean, listen, it's almost a statement, right, that we have that sometimes doctors are abusive and sometimes they're aggressive. And we can't handle that because we cannot afford to have our nurses afraid to call the doctor in the middle of the night if they're concerned about a patient if that same nurse is worried that the doctor is going to cuss them out or yell at them or abuse them as a result. As such, Cook Children has a procedure which they've had in place for decades. And the undisputed evidence, as you can see throughout here, is the procedure put in place as to Dr. Thomas is the same procedure that was put in place as to every other doctor who was put in the same circumstance. There is no doubt, as they want to say, that investigation should happen under a certain time period and that there should be certain manners done. But the record is also clear that that's not really the way things have worked at Cook Children's and that Dr. Thomas was treated the same way every other physician was in the same or similar circumstances. And I think the point that Judge Davis made is critical in the sense of the way Cook was dealing with this. Cook Children's liked Dr. Thomas. Cook Children's wanted to keep Dr. Thomas. Cook Children's could not, however, find themselves in a physician where they had a doctor who all of the nurses were refusing to work with and were complaining of. Dr. Thomas is, in this sense, a unicorn in our hospital. No one has received more complaints. No one has received more allegations of abuse than he has. And it's not even close. How many different nurses and staff members complained? So we can't tell the exact number because the complaints themselves are often filed anonymously. What we can say from the record that's before us is where the complaints are filed tell us a lot about how many different nurses we're dealing with. Complaints, for example, in the operating room tell us there are nurses that are in that area. Complaints about post-op, complaints in the PICU, complaints throughout other wings of the hospital. As Dr. Reeves pointed out, part of what concerned them most about Dr. Thomas's complaints were that it was clear that there were a tremendous amount of nurses throughout different parts of the hospital. So when he first met with Dr. Thomas, for example, and Dr. Thomas said, well, I don't know what he's talking about. I think this is a problem. He said, and we don't dispute it, wow, well, maybe there's some sort of conspiracy. Maybe we have some nurses out to get you. I'm going to go figure this out. And when he did do his investigation, he indeed was able to confirm that the problem with Dr. Thomas wasn't limited to two or three nurses in the operating room, that Dr. Thomas's complaints related to the nurses were throughout our hospital and in different areas. But as far as exact numbers, we don't know. Certainly we put in front of the court down below affidavits from two nurses in particular. They not only described their problems, they also described other things they had seen with other nurses. We also put in the affidavit of Valerie Warren, our nursing supervisor, as well as the affidavit of Dr. Reeves, who's the one who went and did the investigation. What about the affidavits who said that it never happened? So those aren't what those affidavits say. What they have done is put two affidavits from two nurses who said, in my experience, when I was with Dr. Thomas, he was great. And neither of the nurses had been with Dr. Thomas for a while, as they pointed out in their affidavits that they submitted. But Your Honor, we're not trying to say that Dr. Thomas was rude or horrible to everybody. I don't think that's our burden. If he's fine with one person and horrible with somebody else, it's still a problem we have to deal with. And I will say, by the way, those affidavits that they talk about, for the first time show up at the summary judgment stage, those aren't things that he put forward to the Cook Children's Peer Assistance Committee or the Joint Credentials Committee when they were trying to make their decisions. In fact, interesting point, at no point in time while I was there did Dr. Thomas suggest that the complaints that had been filed against them were racially motivated. The first time that argument is made, you know, isn't even in the complaint, right? The first time that they say the underlying complaints that were filed against him and the event reports were racially motivated is their first admitted responses to the interrogatories in this case, which was the day before Dr. Thomas' first deposition. How many staff members did Dr. Reeves talk to? So the record is not 100% clear on that. What he says is he spoke with Valerie Gibbs, who's the director of perioperative services, and then he indicates that he spoke with several other nurses. I do not believe that he indicates an exact number, Your Honor. The issue that we ran into, though, is that, and this was the biggest problem we had, was that there seemed to be just a complete and utter disconnect between Dr. Thomas and the non-physician medical staff. In other words, Dr. Thomas thought his relationship was great, and they didn't. And that was a problem that we were facing that we weren't quite candidly prepared for. What do we do when one doctor says, I'm not doing anything wrong, and every single nurse that we spoke with said there was a problem? The answer is we knew something needed to be fixed here, and we needed to figure out a way to do it. One solution would have been to do more investigation, wouldn't it? Not necessarily, because again, one of the things the committee pointed out is it wasn't the actual complaints that were raised as far as the filed event reports. In other words, for example, one they point out is this Code Grey incident, which to be clear, is not, that's one from years before the incident in question, it wasn't one they reviewed at that time. That was a situation where, Code Grey is a weather report, there's adverse weather, there's a policy at the hospital as to how to deal with surgeries when there's a tornado bearing down on the hospital. In that particular case, there is no doubt that when it was put before the Peer Assistance Committee, that investigation, they made two determinations, one of which Dr. Thomas conveniently fails to point to court out, but it's in the record, obviously. Number one, they said, you know what, we think Dr. Thomas's actions as far as his decision to go forward with the surgery was fine, and that the person who was raising with him, the non-medical staff, that the policy required him to postpone the operation, that was wrong. But the way Dr. Thomas chose to communicate his view on that was wrong, and he needed to fix it. And that's the issue we kept running into with Dr. Thomas. It wasn't an issue of, well, you know, that he was, you know, getting called wrong on the medical issues. It wasn't that he was making wrong decisions there. The issue that we run into is the nurses felt that he was abusing them in the way he spoke with them and the way he interacted with them. And that ranged from situations where he was being accused of throwing things on the metal tray in the table in an operating room, which obviously there's sharp instruments involved in there, to things where he just yelled at people or abused them or acted in such a way. So the problem that the hospital was dealing with in that situation is not a matter of was this particular complaint on this particular day valid. It was what do we do in this situation. And as the Court has pointed out several times, and as you point out as well, Judge Davis, the issue of how this Court deals with this issue is very specific, right? This Court is not going to turn itself, as it has indicated in prior opinions, into a super HR department. The issue instead is whether or not, we don't look at whether or not we made a wise or even correct decision, as this Court said in the Owens-Bryant v. Kompas case, and in fact, they could be unreasonable as long as it wasn't discriminatory. And I don't think they were unreasonable here. And the reason we can say that is, remember what they had in front of them at this point in time. We had a doctor with a history of this issue and a doctor who had previously been sent to counseling, who at no time in his previous incident raised any issues of discrimination or suggestion that he was being treated unfairly. And in fact, the records that we got back at the time were statements from his psychologist, which are in the record, which indicate that he was dealing with anger management issues, that Dr. Thomas had a problem when he felt challenged by underlings, but they had no problems dealing with his peers. Instead, he had that. And we had Dr. Thomas' statements contained in those same letters and statements that he made to the committee, also contained within the record below, that Dr. Thomas admitted that he had this problem and that his work with the counselor had given him tools to cope with that problem. So all of a sudden, in 2019, when Dr. Thomas appears before the committee again, what the committee has in front of it is a situation that would be normal except for the volume of complaints and a history with Dr. Thomas where he has previously indicated that he has this problem and that a previous trip to work with a counselor was effective in dealing with him. This becomes critical on the retaliation issue because while they continuously try to argue some sort of retaliation and they focus on this time period, it is key to realize that the things that they are alleging when they talk about the last several months is that by that point in time, Dr. Thomas is already put in front of the peer assistance committee. Dr. Thomas already has a minimal or a shortened time period for his renewal. Those can't be retaliatory. The first time even Dr. Thomas claims that he engaged in any sort of protected activity was this meeting that happened in 2018. While we understand the court should take that in the light most favorable, you know, what happened in 2018 as is undisputed is that a complaint was filed against Dr. Thomas alleging he was being discriminatory. He was brought in to answer for that. Only two people knew of that complaint. At that time, that was investigated. It was determined that the complaint against him was inaccurate, so it was dismissed. And during that meeting, Dr. Thomas said, I actually think I have been discriminated against and he gave two specific examples. Those were investigated. Those were also determined not to be valid complaints. He made later complaints too, didn't he? He did, Your Honor. But what's key is the later complaints happen after he's already before the peer assistance committee, after his term has already been put for a shorter time period. And key at this point, Your Honor, is from that time, from 2019 until the day he resigned from the hospital, every single communication and every single thing that happened to him, he claimed was retaliation. Why wouldn't that be protected action? It certainly is protected action to make those claims. But what does not happen is it still means that he's required to prove some sort of connection between the protected action and the result that comes forth. And it cannot be retaliation that when you were before a committee that is trying to make some decisions and help you, for that committee to finish their actions, right? In other words, the fact that he was there and there was a process in place and that to be discriminatory. I gather that the JCC ordinarily followed the recommendations of PAC, P-A-C, but they didn't do that here. Can you explain why they didn't? So that never happened before here, right? So the peer assistance committee or the PAC has no power by itself. They simply try to reach discussions with the doctor on a voluntary basis. Every single time it has been before the peer assistance committee, there's been an agreement reached. We've never had a situation where a doctor said, I didn't do anything wrong, I'm absolutely not willing to accept any responsibility, I'm absolutely not willing to do that. So there's never been a situation like what happened with Dr. Thomas with us. Am I wrong that one of the peer assistance delegates is Perez? Dr. Perez is both a member of the peer assistance committee and was one of the three people who volunteered to go meet with Dr. Thomas. So I don't get it. If Perez says on October 14th, 2019, that Cook had to work twice as hard as a black man, I mean, I understand Perez comes up with these other explanations for why that statement was made. But, I mean, that sure seems like it's in the relevant time period. Your friends on the other side say that's definitional retaliation, and I'm not sure I really understand your argument other than, well, it was because — I'm sorry, is Perez a man or a woman? I forgot. She is a woman. A Hispanic female. Right. So that she's saying it as sort of to, like, empathize or something, I gather, is your contention. But that strikes me as the exact kind of thing that they would need to come forward at that stage. So focusing, as you're saying, on the retaliation issue, there's two points that need to be dealt with. I mean, obviously, there were four people in that room, three of the four said that comment never happened. But we understand in the court, you know, that's no less an issue that goes to the jury. But what is important is to understand exactly what Dr. Thomas said about that. So in the record below, in front of the court here, would be, you know, he was deposed a second time at court order. And he defined exactly what that statement was on page 259 of a second deposition. He specifically said it was not a statement of racial animus. Right? This was not a statement where someone came in and said, you know, because you did this. What she said was, according to him, quote, as an African-American male, you have to work twice as hard to be here. I know this has been rough for you. I get it. And then when asked about what he thought that statement meant and how he took it, he stated that it was clear that she sympathized with him and pointed out that she had had similar issues in her past and that she got that, you know, people had to work hard to be here. Yeah. But their point is not that Perez was discriminating against Dr. Thomas. The point is that she's on this peer assistance committee thing and she's speaking as part of the Cook Institutional response to him as a black man is what I, that's what I understand the argument to be in. So I don't understand how leaning into it and saying like, yeah, we, I've experienced it too. That seems to hurt your clause more than help it. I'm not, I'm not sure I understand your response to it. I think that part of the problem is I'm trying to be as open as I can about the fact of what is and is not in the record on that point. I mean, certainly I will tell you that no one, and so the problem is therefore how can a jury take it, right? Certainly the statement that she has made and what I think is here wasn't a statement that you have to work twice as hard at Cook's. The statement was, look, I get it. As a, as a minority to reach this point, you've worked twice as hard and now you're feeling bad about it. And he said the way he took that was that she was saying, hey, you got to work, work twice as hard here. I understand that point. But what is not there, you know, as far as if we're talking about retaliation, what you then have to do is tie what ultimately happened to Dr. Thomas and say, all right, was it because of that? And one thing this Court has said over and over again is, look, to the extent that there is a statement made here or there, you know, that's, you know, falls under the, as the Court said, the straight comment doctrine rather than an issue that shows that there's some sort of pervasive discriminatory basis. And we know here is, I mean, that's clearly not the case with Dr. Thomas, right? No one's actually saying the guy worked twice as hard. No one's actually saying he suffered any problems. In fact, their issue is he had been in this hospital for years, had numerous other African-American pediatric surgeons throughout this period, all of which, the same nurses we didn't have problems with, all of which worked there and nobody raised any complaints. Instead, the one issue is, you know, what he complains about as far as retaliatory is, you know, is what happens after this day. So then the question becomes, all right, if we say that that somehow is a sign of retaliation, what are we then pointing to to say this, therefore, ties into the racial animus? And the problem is there's nothing they can point to at that point in time because the way he was treated is the exact same as everyone else in his circumstance has been treated, right? You have in front of you the two comparators that they put forth, right? And the two comparators that they put forth, they specifically showed, the evidence in the record is they got treated the exact same as Dr. Thomas. We put forth, because, you know, they're original, but when we had to file our motion for summary judgment, they claimed every doctor in the hospital was a comparator. So we tried to point out ones to try to respond to that and pointed out that, you know, here's 10 to 15 other doctors in the same situation that are treated here. And they all get treated the exact same way. So if you're going to say, all right, well, she made, you know, he made this complaint and therefore you reacted accordingly. I think the problem is the record doesn't bear out that any of those could be racially motivated because they all tie directly into how every other doctor in the exact same situation is treated. It's interesting to note the one they point out, by the way, when they say, hey, wait a minute, you asked him to sign something, which there's no doubt that happened. But it's also important to note what actually happened and when this court deals with the issue of, you know, was this somehow a negative act towards him, which could somehow lead to an issue of retaliation or discrimination, where it went, because what happened was they went to Dr. Thomas to try to get him to agree to certain things. Despite their statement that he agreed to everything, he never would officially commit. Instead, the record shows, and you've got both the correspondence from him, the emails down below, as well as the affidavits, where he's constantly asking questions, well, what does this mean? Where does that go? I don't understand. What are you asking me to do here? And that kept continuing and continuing and continuing. Mr. Harper, let me stop you. You've given a very thorough answer to Judge Oldham, but why don't we cut it off there if Judge Oldham is satisfied, and I don't know if he is. Let me ask you about this effort to get him to sign the agreement that had not apparently agreed, that it never had gotten to that point with any particular doctor. What I heard opposing counsel say, it's not so much the difference between signing and sending an email saying I'm agreeing to all of it. It's that he was being forced to basically concede or waive whatever kind of claims he had. And I heard Judge Edges a while ago respond to that. So two issues there. Probably the most important is that ultimately that, when he complained about it, that was taken away. Right? So the Peer Assistance Committee could only engage in a voluntary action. They can't set things. When they didn't, all they did was send an email. Was he being asked in this agreement, basically concede that I have no claim of retaliation, have no claim of discrimination, whatever, would that have been the effect of this agreement? No. And the reason is, Your Honor, what that actually is, is an attempt to, I would say that was point number two, which is that, what actually is an attempt to keep it protected under the peer, the Texas Peer Review Privilege. Right? Obviously, this is a Peer Review Committee. Actions before that committee are protected. That way it doesn't go out on a doctor's note as the evidence, and there's affidavits from four different doctors in the record as to why it's done this way. Because if we actually did what we all agreed was constructive action, we have to file a report, and that report follows him forever. So every place he ever wants to go, there's a permanent report in the federal doctor registry indicating that he has done something and had corrective action. So we try to say to all of our doctors, look, this is peer review, this is not corrective action, that's why it's voluntary, that's why we work with you. And when he complained about the letter, that's why the ultimate decision, what was handed to him, because the only people who can make a decision on his future is the Executive Committee for the Board. And that's why you have in front of you the formal letter from our President, Dr. Nancy Seichel, who specifically said, you're complaining about putting it in writing? Fine. Just tell us you're going to do it. I mean, phone call, e-mail, just some action to show it. And we got rid of that exactly because he complained. Thank you, Your Honor. Can I address that last issue first about, oh, that voluntary agreement, it was fine, it was to protect him? He was the only one in the history of the hospital to ever have to sign that. So all those protections that he's talking about would exist anyway because no other doctors ever had to sign this, no matter what. So that's, it's another exception that shows there's something going on with signing this. Well, he wouldn't accept any responsibility or agree he did anything was wrong, so why wouldn't they logically want him to sign something saying he'd agree to it? Or at least send an e-mail. He can say, I agree to it, I don't want to agree to this, I'll agree to all the conditions. Fine. I don't want to agree to this agreement. I don't like the way it's worded. I don't want to agree to it. And no other doctor has ever had to agree to it. Well, Mr. Harper just said he never had gotten to that point with any other doctor who didn't accept what the initial conclusions were of the peer review committee, whatever it's called. What do you say to that? Well, if the other doctors accepted the conclusions? Well, you're trying to make it unique, but is it also true that it's unique that it ever went this far with a doctor? Where a doctor did not accept the conclusions and still, I don't know, there's nothing in the record one way or the other for that, but it's logical that if someone didn't accept the conclusions, they would say, I don't want to agree to it, I'll agree to the conditions, but I don't agree that I did something I didn't do. As to the comparators, all the same things happened? No, the two comparators did not have to be monitored by any nurses. The two comparators did not have to go to a course for distressed physicians, which is a severe mark on a career, have to disclose that to the future. And none of them had to sign this same document. So that... Mr. Thomas had quite a few more event reports than those other two comparators, though. Not during a two-year period. On Dr. Iglesias, he had more during a two-year period. If you look at the two-year period, they were saying we're going to look at 17 through 19 was the relevant period. Dr. Beam said that's the relevant period that we'll look at. If you look at a two-year period, or the previous two-year period, but they put him on the counseling, Dr. Iglesias exceeded that. Even abusive behavior exceeded it. So... Did either one of the comparators have a history that Dr. Thomas had of prior compliance? Or did they have a similar problem before? Yes. Yes. In fact, Dr. Iglesias, it continued, so did Faf. Dr. Iglesias was the one accused of the violent behavior, slamming his fist. Faf was accused of not responding and admitted to not responding to pages for when children were in distress. No, I mean like the two-year problem they had with Thomas before that went through the same thing before. Went through the same thing before, promoted, given medical director, and then continued event reports against him. No consequence. That's in the record. Also... Did the comparators have that prior history like that? The comparators have a history of continued event reports. Is that what you're talking about? I'm sorry. And being sanctioned and having to go through counseling? One time. One time. The comparators did? Yes. Okay. They were... For how long? For coaching. They were asked to coach. They were not given monitors. They were not given a distress course. And they were not asked to sign this agreement. And it was not shortened again, even though they got more events. Their time period was not shortened again after they got more events. So... So it's not in the record, as counsel said. There is no... Nothing in the record that any nurse was interviewed about any complaint. Nothing in the record about an actual nurse that made a complaint said anything. So when he says that Dr. Reeves talked to nurses who complained, he only talked to an investigator or the nurse manager. Nothing in the record showing that he actually talked to a nurse that complained. The anonymous complaints could have all been made by one person. In fact, you can see from the complaints they all come from the OR, either before or after. He interacts with hundreds of nurses throughout the hospital, and the complaints are not coming throughout the hospital. They're coming from the OR. They can see that. So it's a concentrated feud. Thank you, Your Honor. Thank you both for helping us understand this case from your different points of view. We'll take it under advisement. I'll call the second...